**UNITED STATES DEPARTMENT OF The TREASURY, Appellant,**

v.

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MOTORS LIQUIDATION COMPANY, Appellee.**

**Export Development Canada, Appellant,**

v.

**Official Committee of Unsecured Creditors of Motors Liquidation Company, Appellee.**

Nos. 12 Civ. 561(CM), 12 Civ. 695(CM).

United States District Court, S.D. New York.

July 3, 2012.

348

## DECISION AND ORDER

McMAHON, District Judge.

Appellants United States Department of the Treasury ("Treasury") and Export Development ("EDC") ask this Court to overturn an order of the United States Bankruptcy Court (Gerber, B.J.), dated November 28, 2011, which granted summary judgment in an adversary proceeding in favor of Appellee Official Committee Of Unsecured Creditors Of Motors Liquidation Company (the "Committee").[1] This decision can be found at *In re Motors Liquidation Co.*, 460 B.R. 603 (Bankr. S.D.N.Y.2011).

Because this case is not yet ripe for adjudication, I vacate the Bankruptcy Court's decision and direct that the complaint be dismissed without prejudice.

## BACKGROUND

### I. The GM Bankruptcy

By now, the story of how General Motors faltered and was bailed out is well-known; for background, the reader may refer to Judge Gerber's thorough decision in *In re General Motors Corp.*, 407 B.R. 463 (Bankr.S.D.N.Y.2009), *stay pending appeal denied*, 2009 WL 2033079 (S.D.N.Y. 2009), *appeal dismissed and aff'd*, 428 B.R. 43 (S.D.N.Y.2010), and 430 B.R. 65 (S.D.N.Y.2010), *appeal dismissed*, No. 10–4882–bk (2d Cir. July 28, 2011). Familiarity with the basics of this bankruptcy is presumed.

In 2008 and 2009, Old GM, then known as General Motors, began to suffer "a steep erosion in revenues, significant operating losses, and a dramatic loss of liquidity, putting its future in grave jeopardy." *Id.* at 476. Upon request, the United States Government began providing financial assistance to Old GM in late 2008, to help it survive while it attempted to turn around its fortunes. Things did not work out. Treasury suggested that, if Old GM was "unable to complete an effective out-of-court restructuring, it should consider a new, more aggressive, viability plan," i.e., it should file a bankruptcy petition to avoid further erosion of value. *Id.* at 478. The thought was that, within a bankruptcy proceeding, Old GM would be able to sell substantially all of its assets to a Treasury-sponsored purchaser in an expedited sale under section 363 of the Bankruptcy Code (the "Code"). "Under this game plan, the Purchaser would acquire the purchased assets; create a New GM; and operate New GM free of any entanglement with the bankruptcy cases." *Id.* at 480.

Under the terms of the expedited section 363 sale, New GM would be owned by four entities: Treasury, EDC, a New Employees' Beneficiary Association Trust, and Old GM. *Id.* at 483–84. Old GM was to own 10% of New GM's common stock on an undiluted basis if the chapter 11 plan of reorganization was implemented. It would also be due an additional 2% if the allowed prepetition general unsecured claims were to exceed $35 billion. *Id.* at 484. Old GM's interest in the New GM is referred to in this litigation as the "New GM Equity Interests."

---

1. The Governments appeal the judgment entered as a result of the summary judgment decision, and from related rulings and orders incorporated therein, including the Order Denying the DIP Lenders' Motions to Dismiss and Motions for Summary Judgment, which was entered on December 2, 2011, and an Errata Order, which was entered on December 12, 2011.

As a part of this arrangement, Treasury and EDC (referred to collectively as "the Governments") agreed to provide debtor-in-possession ("DIP") financing to Old GM. *Id.* DIP financing would both ensure that Old GM could continue to operate through the completion of the section 363 sale, and fund the liquidation and wind-down of the remaining assets and liabilities of Old GM. The Governments eventually provided over $30 billion to achieve the former, and $1,175 billion to accomplish the latter.

On June 1, 2009, GM and certain of its subsidiaries filed chapter 11 bankruptcy petitions (the "Debtors"). The Debtors in this case include "GM, Saturn, LLC, Saturn Distribution Corporation, and Chevrolet–Saturn of Harlem, Inc." (R 190.[2]) In the five weeks following the petition, Judge Gerber signed three orders approving the DIP financing, discussed below.

On July 5, 2009, Judge Gerber approved the section 363 sale of Old GM's assets to the New GM.

## II. The Avoidance Action

In the adversary proceeding on appeal, the Committee seeks a declaration that the Governments have no right to any proceeds that may be awarded in an avoidance action that the Committee brought on behalf of the Old GM bankruptcy estate (the "Avoidance Action").

The Avoidance Action involves a $1.5 billion pre-bankruptcy petition secured loan made to GM. When GM filed its bankruptcy petition, "The Prepetition Term Lenders [who made the $1.5 billion loan] were paid [by the bankruptcy estate] because their bank agent asserted they were oversecured by, among other things, a security interest in the Debtors' assets."

**2.** Citations to "R" are to the record provided by Treasury in support of their appellate pa-

(Committee's Opp'n at 3.) In the Avoidance Action, the Committee asserts that this loan may have lost its secured status prior to the filing of Old GM's bankruptcy petition:

> Months before the bankruptcy, Old GM's counsel caused the filing of a form UCC–3 that terminated the security interest with respect to most of those assets. The UCC–3 was filed with the consent of bank agent's counsel, as communicated in emails and signed escrow instructions. If these facts constitute "authorization" by the bank agent, the Prepetition Term Lenders forfeited most of their collateral, and the $1.5 billion postpetition payment is potentially voidable.

(*Id.*)

The Committee filed the Avoidance Action, pursuant to the authority granted to it by the Final DIP Order (discussed below), in order to void the payment and recover for the bankruptcy estate the approximately $1.5 billion paid to the Prepetition Term Lenders. (*See Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, Adv. Pro. No. 09–504, 2009 WL 2446727 (Bankr. S.D.N.Y. July 31, 2009) (ECF No. 1).)

Cross-motions for summary judgment in the Avoidance Action are presently *sub judice.*

The issue in this case is who will enjoy the proceeds from the Avoidance Action—if there are any.

## III. The DIP Financing of the Old GM Chapter 11 Bankruptcy

Judge Gerber signed three post-petition financing orders between the Governments and Old GM (as the debtor-in-possession):

pers.

(1) An "Interim" DIP Financing Order, entered on June 2, 2009 (the "Interim DIP Order");

(2) A "Final" DIP Financing Order, entered on June 25, 2009 (the "Final DIP Order"); and

(3) A modified final DIP financing order, revised to address, financing needs during the post–363 sale "wind-down" of Old GM's chapter 11 case, entered on July 5, 2009 (the "Wind–Down Order");

*In re Motors Liquidation Co.,* 460 B.R. at 608.

### A. The Interim DIP Order

On June 1, 2009, "Old GM moved for approval of its DIP financing—for an ultimate $33.3 billion, with $15 billion of the $33.3 billion to be borrowed on an emergency, interim, basis." *Id.* at 609. On June 2, 2009, Judge Gerber signed the Interim DIP Order, approving borrowing of up to $15 billion.

For readers who are unfamiliar with post-bankruptcy petition financing arrangements:

> Creditors are often loathe to knowingly extend credit to entities in reorganization. Apart from the onus of bankruptcy, payments may be deferred months or years even if the reorganization is a complete success. . . .
>
> Recognizing this reluctance, Congress, in Code § 364 structured an escalating series of inducements which the debtor-in-possession may offer while attempting to obtain credit for use in the reorganization. First, under § 364(a) the debtor may obtain unsecured credit needed in the ordinary course of business, and accord that credit administrative expense priority, simply by offering the priority. If the creditor is reluctant to advance credit, a superpriority, or liens junior to other encumbrances on property of the estate, may be offered, subject to court

approval, under § 364(c). For the most recalcitrant and necessary creditors, the court, under § 364(d) may authorize the obtaining of credit secured by liens senior to or of equal priority to existing liens on property of the estate, as long as the existing lien holders are adequately protected.

*In re Glover, Inc.,* 43 B.R. 322, 324–25 (Bankr.D.N.M.1984) (footnotes omitted).

To protect the Governments' ability to be repaid, Judge Gerber authorized (as requested by the Governments) both post-petition liens, under sections 364(c)(2) and 364(c)(3) of the Code, and a superpriority administrative expense claim (the "Super-Pri"), under section 364(c)(1) of the Code, subject to the "Carve–Out." Recording to Judge Gerber, the Carve–Out included "professional fees (up to a specified amount), 'burial expenses' [if the chapter 11 case is converted to a chapter 7 liquidation] (also up to a specified amount), and fees payable to the Office of the United States Trustee." *In re Motors Liquidation Co.,* 460 B.R. at 609. The items included in the Carve–Out "thereafter changed slightly, [but] in respects not material" to the disposition of this appeal. *Id.*

A SuperPri is a right to payment that has "priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Code]." 11 U.S.C. § 364(c)(1). However, it is subordinated to preexisting secured claims. Collier on Bankruptcy ¶ 364.04[2][a].

### B. The Final DTP Order

On June 25, 2009, Judge Gerber was asked to, and did, consider and approve the DIP financing in the full $33 billion amount. *In re Motors Liquidation Co.,* 460 B.R. at 611.

The Final DIP Order "reaffirmed the super-priority administrative claim of the [Governments], but subject to each of the Carve–Out and administrative expenses up to a $950,000,000 cap, corresponding to the amount allocated at the time for the Wind–Down." *Id.* This amount would eventually be increased to $1,175 billion. In addition, the Final DIP Order excluded from its liens the Avoidance Action and the New GM Equity Interests "issued to the Debtor pursuant to the then-contemplated 363 sale." *Id.* at 612.

The Final DIP Order also gave the Committee the sole "authority to investigate and bring action on claims based on deficiencies in lien perfection within a specified time," i.e., the Avoidance Action. *Id.* (footnote and citation omitted).

Last, the Final DIP Order outlined the contours of what would become the Wind–Down Loan, which was to be formalized in an amendment to the loan documents (the "DIP Facility"), and approved by the Bankruptcy Court.

## C. The Wind–Down Order

On July 5, 2009, Judge Gerber issued the Wind–Down Order and the Amended DIP Facility (the "Wind Down Borrowing Agreement"), thereby approving the Governments' $1,175 billion postpetition Wind–Down Loan to Old GM (the "Borrower"). As discussed above, the purpose of the Loan was to finance the wind-down in bankruptcy of the estate's assets and liabilities after the sale of its viable assets to the predecessor to the New GM (the section 363 sale).

According to the parties, only the Wind–Down Order and the Wind–Down Borrowing Agreement require interpretation in this lawsuit. I note, however, that the Wind–Down Order quite clearly states that the terms of the Final DIP Order are still in effect, except as modified by the Wind–Down Borrowing Agreements. (*See* Wind–Down Order at 4 (R 193).) This is important, because the Final DIP Order—not the Wind–Down Order—is where the Governments' SuperPri and liens originate. (*See* Final DIP Order at 14–16 (R 85–87).)

The Wind–Down Order incorporated the SuperPri and liens issued in the Final DIP Order, subject to the modifications in the sixth of its unnumbered decretal paragraphs (the "Decretal Paragraph 6"), which provides, in relevant part:

**ORDERED** that the claims and liens granted to the DIP Lenders under the Final DIP Order shall apply as set forth therein to the Amended DIP Facility except as explicitly modified by the following upon the Effective Date . . . :

(a) the claims of the DIP Lenders arising from the Amended DIP Facility, pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, . . . shall be and are accorded super-priority administrative expense status . . . , and, subject only to the Carve–Out, shall have priority over any and all other administrative expenses . . . arising in these cases; . . . and

(b) the DIP Liens granted under the Final DIP Order (i) shall continue under the Amended DIP Facility on the Property in the same force, effect and priority as set forth in the Final DIP Order to the extent any such Property remains Property of the Debtors . . . (ii) shall continue to be subject to the Carve–Out, and (iii) shall include the proceeds of the Amended DIP Facility; provided, however, notwithstanding anything to the contrary in this Order, the Final DIP Order, DIP Credit Facility or the Amended DIP Facility, the DIP Liens shall not include security interests in or liens on avoidance actions arising under chap-

ter 5 of the Bankruptcy Code against the Prepetition Senior Facilities Secured Parties ... or any stock, warrants, options, or other equity interest in [New GM]....

(Wind–Down Order at 4–5 (R 193–94).) This language is clear enough. The SuperPri is subject only to the Carve–Out. The liens are subject to the Carve–Out, and do not extend to the Avoidance Action or the New GM Equity Interests.

Decretal Paragraph 10, however, further provided, in relevant part:

ORDERED that the Loans ... shall be nonrecourse to the Borrower and the Guarantors, such that the DIP Lenders' recourse under the Amended DIP Facility shall be only to the Collateral (as defined in the Amended DIP Facility) securing the DIP Loans, and nothing in this Order, the Final DIP Order, the DIP Credit Facility or the Amended DIP Facility shall, or shall be construed in any way, to authorize or permit the DIP Lenders to seek recourse against the New GM Equity Interests at any time.... [3]

(*Id.* at 6 (R 195).) As discussed above, one of the conditions for the section 363 sale was that the Governments have "New GM issue 10% of its new common stock, plus warrants with a value roughly equivalent to an additional 10% (the 'New GM Equity Interests'), to Old GM for distribution to its unsecured creditors under a plan of reorganization." (Committee's Opp'n at 5.) According to Judge Gerber, the New GM Equity Interests are the only meaningful source of recovery for unsecured creditors, unless: (1) the estate realizes money from the Avoidance Action; and (2) that money is immune from or exceeds the

Governments' SuperPri claims. *See In re Motors Liquidation Co.*, 460 B.R. at 631.

The Wind–Down Borrowing Agreement contains an analogous provision:

2.1. *Loans.* On the Effective Date, the Lenders made the Tranche C Term Loans in Dollars to the Borrower in the aggregate principal amount of $1,175,000,000 (the "Loans"). The Loans shall be non-recourse to the Borrower and the Guarantors and recourse only to the Collateral.

(Wind–Down Borrowing Agreement § 2.1 (R 227).)

The Wind–Down Borrowing Agreement defined "Collateral" to mean, in relevant part:

all property and assets of ... every kind or type whatsoever, ... (including avoidance actions arising under Chapter 5 of the Bankruptcy Code and applicable state law *except avoidance actions against the Prepetition Senior Facilities Secured Parties* [i.e., the Avoidance Action] ...) ... [and] other than Excluded Collateral.

(*Id.* at 6 (R 209) (emphasis added).) "Excluded Collateral" includes the New GM Equity Interests. (*Id.* at 9 (R 212).) The "Prepetition Senior Facilities Secured Parties" were Old GM's prepetition lenders—including, most significantly, JPMorgan Chase and the other lenders under the Term Loan—under a number of secured borrowing facilities (referred to herein as the "Prepetition Term Lenders"). Thus the DIP lenders would get liens on most of the avoidance actions, but would not get a lien on avoidance actions against Old GM's Prepetition Secured Lenders (i.e., the Avoidance Action).

---

**3.** The Borrower is defined in the Wind–Down Borrowing Agreement as "MOTORS LIQUIDATION COMPANY (f/k/a General Motors

Corporation)". The Guarantors are not defined in the Wind–Down Borrowing Agreement, or in the record before the Court.

## IV. The Dispute

The tension between the provisions in Decretal Paragraphs 6 and 10 gives rise to this controversy over the potential proceeds of the Avoidance Action.

Both sides agree that the Governments do not have a "lien" on proceeds of the Avoidance Action. The parties disagree over whether the Governments can nonetheless call on any Avoidance Action proceeds to satisfy their SuperPri claim. The Committee contends, in substance, that the "nonrecourse" language in Decretal Paragraph 10 limits the earlier grant of the SuperPri in Decretal Paragraph 6(a) to assets other than: (1) the proceeds of the Avoidance Action; and (2) certain stock in New GM. Although Decretal Paragraph 6(a), by its terms, only subjects the SuperPri to the carve-out specified in that paragraph, the Committee asks the Court to infer, from the "nonrecourse" language of Decretal Paragraph 10, that the parties limited the funds out of which the SuperPri could be paid to the Collateral for the liens (of which the Avoidance Action is not part).

The Governments dispute that. They contend that the "liens" and SuperPri "claims" create two separate entitlements, and that nothing in the documents deprives them of their SuperPri rights, other than the carve-outs explicitly recited in Decretal Paragraph 6(a). They note that the parties knew what it took to modify expressly the Governments' superpriority rights, that the parties did so in other respects, and that they chose not to do so by not including a reference to "recourse" or "Collateral" in Decretal Paragraph 6(a). Instead, the Governments argue that Decretal Paragraph 10 merely established that the Loan would be nonrecourse in the event of a default.

## V. Procedural History in the Bankruptcy Court

The Committee first sought a declaration that the Governments were not entitled to any proceeds from the Avoidance Action in October 2010, shortly after the cross-motions for summary judgment in the Avoidance Action were fully briefed. *In re Motors Liquidation Co.*, 460 B.R. at 616. Treasury argued at that time that there was no then-justiciable controversy. *Id.* Judge Gerber ruled from the bench that the Committee's motion was not ripe. *Id.* The Committee did not take an appeal.

Between that dismissal and the filing of the current lawsuit, the Debtors filed their proposed "Second Amended Joint Chapter 11 Plan" (the "Plan"), which was confirmed on March 29, 2011 (the "Confirmed Plan"). Among other things, the Confirmed Plan directed the transfer of the Avoidance Action from the Committee to a trust (the "Avoidance Action Trust" or "Trust").

Shortly after, in June 2011, the Committee filed this declaratory judgment action. Although the Bankruptcy Court had not yet decided whether the estate could recover anything in the Avoidance Action, the Committee contended that the issue of the Governments' right to any proceeds of that action was ripe for adjudication, because Old GM's unsecured creditors would suffer adverse tax consequences from this transfer unless the beneficiaries of the Trust were determined before the transfer took place on December 15, 2011.

The Committee filed its motion for summary judgment on July 22, 2011. On August 5, 2011, the Governments filed a Rule 12(b)(1) motion to dismiss the case for lack of subject matter jurisdiction, followed by cross-motions for summary judgment on September 2, 2011.[4]

---

4. The Governments also filed a Rule 12(b)(6) motion, but later abandoned it because it was

## VI. Judge Gerber's Decision

Judge Gerber issued his decision on November 28, 2011, denying the Governments' 12(b)(1) motion to dismiss and granting summary judgment in favor of the Committee.

Judge Gerber first determined that he had subject matter jurisdiction over this declaratory judgment action, reasoning that "nothing that could happen to make this controversy more ripe." *In re Motors Liquidation Co.,* 460 B.R. at 617. The reason the controversy had ripened, he ruled, was that the unsecured creditors might suffer adverse tax consequences if the Committee did not obtain a ruling in the instant action by December 15, 2011. *See id.* at 616–17.

The Confirmed Plan provided that, on December 15, 2011, the Avoidance Action and its proceeds, if any, were to be transferred from the Debtors to the Avoidance Action Trust and evaluated for income tax purposes:

> [If] the Term Loan Avoidance Action Beneficiaries have not been identified on or before [December 15, 2011] either by (x) mutual agreement between the U.S. Treasury and the Creditors' Committee or (y) Final Order, then the Avoidance Action Trust Administrator shall treat the ... Trust for ... tax purposes as either (A) a "disputed ownership fund" [governed by Treasury Regulation section 1.468B–9 (including, if required, timely so electing)] or (B) if permitted under applicable law and at the option of the Avoidance Action Trust Administrator, a "*complex trust.*"

*Id.* (citing Confirmed Plan § 6.5(n).)

The Committee argued, "If its recovery is treated as a disputed ownership fund ... any recovery from the trust will be taxed twice." If the beneficiaries of the Trust were "finally determined" before December 15, however, the Committee claimed that "one level of taxation could be avoided, thus allowing for greater recovery to the unsecured creditors."

The Committee's argument depended for its force on the IRS's requiring that the Trust be treated as a "disputed ownership fund." Of course, the IRS had not yet ruled on that issue, so the status of the Trust as a "disputed ownership fund" and the possibility of "double taxation" were still very much open to question. Equally uncertain was who would prevail in the Avoidance Action; unless the Avoidance Action Trustee succeeded in obtaining money from the Prepetition Term Lenders, there would be nothing to tax at all.

Despite the doubly hypothetical nature of the Committee's argument, Judge Gerber concluded that the decision was ripe for adjudication. *Id.* at 618.

As for the merits of the action, Judge Gerber held that Governments had given up their right to reach any proceeds of the Avoidance Action through their liens or their SuperPri in Decretal Paragraph 10 of the Wind–Down Order. *See id.* at 628.

The Governments timely appealed Judge Gerber's decision and related orders to this Court. While Treasury's "Statement of Issues on Appeal" raised the issue of whether this case is ripe for adjudication, it abandoned the argument in its opening brief. (Treasury Br. at 9.) None of the other parties discussed ripeness at all; they focused their energies on the merits of the action.

On May 4, 2012, I heard oral arguments on the Governments' appeals. On June 6,

subsumed within the cross-motions for summary judgment. *In re Motors Liquidation Co.,* 460 B.R. at 616 n. 59.

2012, I propounded several additional questions to the parties, one of which asked whether the Bankruptcy Court had subject matter jurisdiction to decide the case at all.

I conclude that it did not.

## DISCUSSION

### I. Standard of Review

On appeal, the reviewing court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr.P. 8013.

■ "The district court reviews a bankruptcy court's findings of facts for clear error, and applies a *de novo* standard to questions of law." *In re DPH Holdings Corp.*, 437 B.R. 88, 94 (S.D.N.Y.2010), *aff'd*, 448 Fed.Appx. 134 (2d Cir.2011) (internal citations omitted).

■ A court's legal determination that a declaratory judgment action presents an actual case or controversy is reviewed *de novo*, while a court's decision to exercise its declaratory judgment jurisdiction is reviewed for abuse of discretion. *See E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 177 (2d Cir.2001) (citing *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 368 (5th Cir.1998)).

### II. This Case Must be Dismissed for Lack of an Article III Case or Controversy

■ The first (and for now, the only) issue to be resolved in the case is whether the Bankruptcy Court had the constitutional power to decide it. Although the parties did not focus on it on appeal, I cannot avoid the issue, because the dispute between the parties over the Governments' entitlement to claim any proceeds that might be realized from the Avoidance Ac-

tion—a claim they would make by asserting their SuperPri rights—does not give rise to a case or controversy as required by Article III of the United States Constitution.

### A. Legal Standard

Article III of the United States Constitution limits the jurisdiction of federal courts to "cases" or "controversies," as distinguished from advisory opinions. *Olin·Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 17 (2d Cir.1993).

■ The Declaratory Judgment Act provides that, "In a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). However, the Declaratory Judgment Act does not—and cannot—confer subject matter jurisdiction. *E.R. Squibb & Sons*, 241 F.3d at 177; *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 272, 61 S.Ct. 510, 85 L.Ed. 826 (1941). "Subject matter jurisdiction under the Declaratory Judgment Act is limited to an actual controversy, and is coextensive with the case or controversy standard embodied in Article III of the Constitution." *In re Quigley Co., Inc.*, 361 B.R. 723, 736 (Bankr.S.D.N.Y.2007) (internal citations and quotations omitted). Put more simply, if there is no case or controversy, the Court lacks subject matter jurisdiction over the action. *See, e.g., S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch. Inc.*, 24 F.3d 427, 431 (2d Cir.1994). The party seeking a declaratory judgment "bears the burden of proving that the Court has jurisdiction." *E.R. Squibb & Sons*, 241 F.3d at 177 (citing *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993)).

An actual controversy "must be a real and substantial controversy admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. of Hartford v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937). According to the Supreme Court:

> The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Md. Cas. Co.*, 312 U.S. at 273, 61 S.Ct. 510; *Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir.2005) ("The standard for ripeness in a declaratory judgment action is that there is a substantial controversy, between parties having adverse interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.") (internal quotation marks and citation omitted).

"Accordingly, a touchstone to guide the probe for sufficient immediacy and reality is whether the declaratory relief sought relates to a dispute where the alleged liability has already accrued or the threatened risk occurred, or rather whether the feared legal consequence remains a mere possibility, or even probability of some contingency that may or may not come to pass." *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F.Supp.2d 394, 406–07 (S.D.N.Y.2002) (citing *Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)), *aff'd*, 346 F.3d 357 (2d Cir.2003).

Despite the foregoing, the fact that "liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action." *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir.1992). When liability is contingent, the Second Circuit instructs courts to focus on "the practical likelihood that the contingencies will occur." *Id.*

Even where the case or controversy requirement is met—that is, even when subject matter jurisdiction exists—a court may nevertheless decline to hear a declaratory judgment action in an exercise of discretion. *In re Quigley Co., Inc.*, 361 B.R. at 735–36 (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995)). In order to decide whether to exercise its discretion to hear an action for declaratory judgment, the Second Circuit has instructed a district court to ask: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade*, 411 F.3d at 389 (citing *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir.1969)); *see also Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir.2003) (citing additional factors).

Accordingly, the "jurisdictional" analysis in a declaratory judgment action comprises a two part inquiry: (1) whether subject matter *exists* because the declaratory judgment action meets the constitutional case or controversy requirement; and, if so (2) whether the Court should *exercise* that jurisdiction. *In re Quigley Co.*, 361 B.R. at 736. But the first question must be answered before there is

any discussion of the issues raised by *Duane Reade;* "Either there is an actual controversy or there is not. If there is not, there is no discretionary action that a court can take." *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.,* 90 F.3d 671, 675 (2d Cir.1996)

■■■■■ As is true of any matter that touches on a court's power to hear and decide a case, this Court has not only the ability, but also the duty, to satisfy itself that subject matter jurisdiction exists. *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 506, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006). The parties cannot stipulate to the existence of an actual controversy, any more than they can stipulate to the existence of diversity, and the issue is not subject to waiver. The mere fact that there is a dispute over some question (as is the case here, where the parties contest the reach of the Governments' SuperPri rights) is not dispositive; if it were, the Declaratory Judgment Act could be invoked to answer any and every hypothetical question. Our constitutional system gives courts no such power.

## B. Analysis

As noted above, the first time the Committee sought judicial resolution of this dispute, the learned Bankruptcy Judge concluded, based on Treasury's argument, that the matter was not ripe, because it might turn out to be a dispute about nothing. In this, the Committee's second bite at this particular apple, Treasury contends that nothing has changed; the action "remains a dispute about, potentially, nothing," as was the case nine months earlier, and would so remain until the Avoidance

Action was decided in the bankruptcy estate's favor. (Treasury's Bankr.Ct. Mot. to Dismiss at 11–12 (R 292–93).)

The Committee urged that the action had become ripe for adjudication once the Bankruptcy Court confirmed the Plan, because the unsecured creditors might suffer imminent and actual injuries if the question of whether the proceeds of the Avoidance Action were subject to the Governments' SuperPri was not resolved by December 15, 2011—the date that, pursuant to the Plan, the Avoidance Action was to be transferred to the Trust. In the absence of some "final determination" on that issue, the Committee argued, the Trust might be treated for tax purposes as a "disputed ownership fund," which would possibly (though not definitely) result in double taxation of any recovery:

(1) the Trust would owe tax on any increase in the value of the Avoidance Action from the date of transfer until such date as the identities of the Trust Beneficiaries were finally determined (which would reduce the recovery available to the Trust Beneficiaries), (Committee's Opp'n to Treasury's Bankr.Ct. Mot. to Dismiss ("Committee's Bankr.Opp'n") at 5–6 (R 369–70)); and

(2) the Trust Beneficiaries themselves (other than, of course, the Governments, who pay no tax) would have to take into account any amount they received greater than the value of the Avoidance Action on the date of transfer in computing their taxable income, (*id.* at 6 (R 370)).[5]

This Tax Argument depended on three "factual" predicates, two of which were

---

5. In the alternative, the Committee argued that the question was ripe even if the identity of the Trust beneficiaries could not be finally determined by December 15 of last year, because—assuming the Committee was correct

in its conjecture that the IRS would treat the Trust as a disputed ownership fund—the sooner the identity of the Trust beneficiaries could be determined, the lower the impact of any double taxation would be.

hypothetical and one of which was arguably incorrect.

The first hypothetical is that there will be any recovery at all in the Avoidance Action. Should the Prepetition Term Lenders—defendants in the Avoidance Action—prevail on their summary judgment motion, there will be no proceeds from the Avoidance Action. That would render this entire exercise moot—or, as Treasury puts it, this will turn out to be a "fight over nothing."

The second hypothetical (which, as the reader will appreciate, is really a hypothetical on a hypothetical) is that any proceeds that might be realized from the Avoidance Action would be subject to two layers of taxation. We now know (although Judge Gerber could not have known when he issued his decision) that this "fact" is untrue. The Committee has informed the Court that, on some unspecified date, the IRS issued a private letter ruling stating that "no such tax would be due." (Committee's June 15, 2012 Letter to the Court at 4 n. 4.) The Committee acknowledges that "the Tax Argument no longer applies" to support subject matter jurisdiction. (*Id.*)

The arguably incorrect factual predicate was that Judge Gerber's decision in this action would "finally determine" whether the Governments' superpriority extended to any hypothetical proceeds from the Avoidance Action. While his decision would be temporarily "final" for res judicata purposes, *Chariot Plastics, Inc. v. United States*, 28 F.Supp.2d 874, 881 (S.D.N.Y. 1998), it would not "finally determine" the matter, because his ruling could be appealed. There was, at the time the Bankruptcy Court issued its decision, the certainty of an appeal to this Court, and the very

real possibility of a further appeal to the Second Circuit. This means the Bankruptcy Court's ruling did not "finally determine," in any meaningful sense, the question that ostensibly [6] needed to be "finally determined" before December 15, 2011—or, for that matter, today.

The Committee propounded a second argument, based on a Second Circuit summary order affirmance in a case called *SR International Business Insurance Co., Ltd. v. Allianz Ins. Co.*, 343 Fed.Appx. 629 (2d Cir.2009).

In *SR International*, an insurer had moved for partial summary seeking a declaration that, among other things, it had a priority claim over the insured to any recoveries that might be won in a separate—and pending—litigation; the parties in *SR International* were both "actively participating" in that separate litigation. *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props. LLC*, No. 01CV9291 HB, 2008 WL 2358882, at *5 (S.D.N.Y. June 10, 2008). The insureds argued that the dispute was not ripe because "it is possible that neither party will succeed in proving liability or damages in the [separate and ongoing] litigation." *SR Int'l*, 343 Fed. Appx. at 632. The Second Circuit rejected this argument, explaining that the fact that "liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action ... Indeed, litigation over insurance coverage has become the paradigm for asserting jurisdiction despite future contingencies that will determine whether a controversy ever actually becomes real." *Id.* (quoting *Assoc. Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir.1992)). The panel then concluded that the district court thus did not

---

**6.** I say "ostensibly" because, as it turned out, the question did not really need to be decided at all.

abuse its discretion in determining that a judgment would "offer relief from uncertainty" and serve a " 'useful purpose in clarifying' the rights of the parties to the proceeds of the [separate and ongoing litigation], avoiding additional litigation and assisting the parties in formulating settlement positions and developing settlement strategy." *Id.*

Although *SR International* is a summary order, and so lacks any precedential value, *see* 2d Cir. Local R. 32.1.1(a), the Committee argued that its reasoning controlled here, since a "declaratory judgment would resolve the parties' uncertainty over ownership of the [Avoidance Action]; clarify the parties' rights to the proceeds of that action; avoid additional litigation; and assist the Committee or the Avoidance Action Trust Administrator . . . in formulating settlement position and developing litigation and settlement strategy." (Committee's Bankr. Opp'n at 8 (R 372).) The Committee asserted that the Administrator could not formulate its litigation and settlement strategy without knowing who the Trust Beneficiaries—as defined in the Plan—were. The Committee cited to the Plan, but did not explain why its argument flowed from that document. Nor did the Committee produce any evidence to support this argument.

The Bankruptcy Court accepted the Committee's Tax Argument. Judge Gerber concluded that the question of who was entitled to the proceeds of the Avoidance Action (assuming there were any) was ripe for adjudication last fall because, if the identity of the Trust Beneficiaries were to be finally determined before December 15, 2011, "one level of taxation could be avoided, thus allowing for greater recovery to the unsecured creditors." *In re Motors*

*Liquidation Co.,* 460 B.R. at 617. Judge Gerber did not even mention, let alone decide, the argument derived from *SR International.*

Having concluded that subject matter jurisdiction existed, Judge Gerber then addressed the separate question of whether he should exercise that jurisdiction. He concluded that he should take cognizance of the issue under the Declaratory Judgment Act, because "both prongs of the *Duane Reade* test are satisfied; my decision clarifies the issue of the ownership of the proceeds of the term loan litigation and offers relief from uncertainty." *Id.* at 618.

As noted above, Treasury identified subject matter jurisdiction as disputed in its statement of issues on appeal, but dropped the issue in its briefs. In response to my post-oral argument questions, Treasury reiterated the arguments that had failed to persuade the Bankruptcy Judge below—principally urging that, until the Avoidance Action is decided, the parties are fighting over nothing.

The Committee, however, conceded that it could no longer rely on the Bankruptcy Court's rationale, because the IRS private action letter had eliminated any possibility that double taxation would diminish the size of the fund available to the beneficiaries of the Avoidance Action Litigation Trust—whomever they might be. In view of this concession, Judge Gerber's finding on the issue of subject matter jurisdiction cannot be sustained unless another argument can be fashioned to support it.[7]

I do not believe that a winning alternative argument can be fashioned from the record before me. Therefore, I am vacating Judge Gerber's order and directing

---

7. I happen to believe the learned Bankruptcy Judge's conclusion was wrong regardless of what the IRS subsequently concluded, but I need not explain why since the Committee has expressly abandoned the argument.

that the complaint be dismissed without prejudice, because there is presently no case or controversy for the court to decide, and there may never be one.

The argument presently argued by the Committee is essentially the argument Judge Gerber did not reach: that the reasoning in the Second Circuit's non-precedential summary order in *SR International* compels a finding of subject matter jurisdiction, even though a verdict (or settlement) in favor of the bankruptcy estate in the Avoidance Action (which would be necessary for the Trust to have any money to distribute to anyone) remains contingent. I cannot disagree that the existence of a contingency "does not *necessarily* defeat jurisdiction of a declaratory judgment action." But in this particular case, it does.

 The first thing to note about *SR International* is that the Committee misreads the case. The panel did not hold that "subject matter jurisdiction existed *because* a judgment 'would offer relief from uncertainty' and serve a 'useful purpose in clarifying the rights of the parties to the proceeds of the [Avoidance Action].'" (Committee's June 15, 2012 Letter to the Court at 3 (emphasis added).) Had the panel actually so held, its holding would have run counter to Supreme Court and Second Circuit precedent, which establishes that relief from uncertainty and serving a useful purpose in clarifying rights are the criteria for deciding whether to exercise discretion to decide a declaratory judgment action in which the case or controversy requirement is otherwise satisfied. (*See* discussion at page 16, *supra.*) They are not the criteria used to determine whether the constitutional case or controversy requirement is satisfied. To make that decision, a court must focus on "the practical likelihood that the contingencies will occur." *Associated Indent. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir.1992).

In *SR International,* the Circuit—unlike the Committee here—did not conflate the two separate questions that relate to the *existence* and the discretionary *exercise* of declaratory judgment jurisdiction. The panel plainly stated that the only thing it was reviewing was the district court's discretionary decision to entertain the case, *SR Int'l,* 343 Fed.Appx. at 631, and applied the deferential "abuse of discretion" test to that question. It did not engage in the sort of *de novo* review required when addressing a finding that subject matter jurisdiction exists. Indeed, all it said about the existence of a case or controversy was that there was no dispute that the "'practical likelihood' of some type of settlements or judgment" existed in the litigation over which the parties were fighting. *Id.* at 632 (citing *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*, 90 F.3d 671, 675 (2d Cir.1996)). In other words, the panel believed there was a practical likelihood—whether by judgment or settlement—that the underlying lawsuit would produce recoveries that would have to be distributed to someone; the existence of those proceeds was not merely "hypothetical," but almost certain (though the panel failed to explain why that was so). Accordingly, the only question to be answered in *SR International* was which party would be entitled to those (almost certain to exist) recoveries—an issue deemed ripe for adjudication.[8]

---

**8.** The summary order in *SR International* highlights why criticism is often leveled at the use of these orders, especially now that parties are free to cite them (despite their lack of precedential value): cursory treatment of the law and the facts can—and often does—lead to confusion in the governing legal standards.

In *SR International,* the Court of Appeals did not delve into the technical—but critically important—difference between reviewing a

Other Second Circuit cases—not summary orders, but actual, precedential decisions—make it clear that, under the "practical likelihood" test applicable to ascertaining whether jurisdiction exists (as opposed to whether it ought to be exercised), a court must assess as a matter of fact how likely it is that the contingent event upon which the controversy rests will occur. *See Associated Indem. Corp.,* 961 F.2d at 35–36; *Am. Express Bank Ltd. v. Banco Espanol De Credito, S.A.,* 597 F.Supp.2d 394, 405 (S.D.N.Y.2009). Unless the contingency is "practically likely" to occur, the controversy lacks "sufficient immediacy and reality" to warrant declaratory relief. *In re Prudential Lines, Inc.,* 158 F.3d 65, 70 (2d Cir.1998). And where a court is being asked to declare who should get the proceeds of a hypothetical judgment based on a hypothetical outcome in a separate pending litigation, courts generally hold that the case or controversy requirement is not satisfied.

The Second Circuit case principally cited for this rule is *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.,* 90 F.3d 671 (2d Cir.1996). There, several "excess liability insurers" (i.e., insurers whose obligations kick-in only after a certain level of liability) sought a declaration setting limits on their liability after the Environmental Protection Agency named the insured a "Potentially Responsible Party" at twenty sites contaminated with toxic waste. *See id.* at 672–73. The court examined the evidence in the record concerning the merits of the separate and pending lawsuits against St. Joe, in order to ascertain "the likelihood of St. Joe's potential liability" under those lawsuits. *Id.* at 673. It considered St. Joe's legal defenses, as well as the likelihood that St. Joe's liability for each site would trigger the excess liability policies that plaintiffs issued. *See id.* at 673–74. The court concluded the case was not yet "justiciable and ripe." It noted: "The record as a whole consists in large measure of speculation. Uncertainty surrounds St. Joe's liability. It has viable defenses, there are numerous other PRPs to share the unestablished remedial costs, and the challenged activity is spread out over a substantial time period...." *Id.* at 674. The court dismissed the complaint without prejudice.

*St. Joe's* was followed in *American Express Bank Ltd. v. Banco Espanol de Credito, S.A.,* 597 F.Supp.2d 394 (S.D.N.Y. 2009), where a construction company working in Pakistan ("Isolux") asked defendant—a Spanish bank—to arrange guaranties to secure Isolux's performance in favor of the Pakistani governmental agency that commissioned the work ("WAPDA"). In turn, defendant asked plaintiff—a bank with a branch in Pakistan—to execute those guaranties. Under the guarantees, plaintiff agreed to pay WAPDA if WAPDA issued a written certification that Isolux failed to perform; plaintiff agreed to waive all objections and defenses under the construction contract. Defendant agreed to repay any liabilities that plaintiff incurred under the guaranties (the "counterguaranties").

finding that declaratory judgment jurisdiction exists (case or controversy) and a finding that jurisdiction is properly exercised as a matter of discretion. And though any mention of the case or controversy requirement in *SR International* is dictum, once the issue was discussed at all, it was incumbent on the panel to cite any evidence supporting its factual determination that there was a practical likelihood of some type of settlements or judgment in the underlying litigation. The panel merely noted that the appellants did not dispute that conclusion. *Id.* at 632. But the absence of dispute cannot confer subject matter jurisdiction, any more than consent can.

Disputes arose regarding Isolux's performance, leading to legal proceedings across the globe. Relevant here, WAPDA and Isolux entered arbitration in Switzerland. Before the arbitral decision, WAPDA filed suit in Pakistan against plaintiff, seeking to enforce the guaranties. Plaintiff then sued defendant in the Southern District of New York, claiming that defendant breached its agreement to pay plaintiff under its counterguaranties. Eventually, the arbitration panel ruled that WAPDA owed Isolux money, and that Isolux owed WAPDA nothing. Even so, WAPDA continued to prosecute its lawsuit in Pakistan against plaintiff, seeking to enforce the guaranties and set aside the arbitral decision.

Plaintiff sought a declaration that, if the Pakistani court eventually held that plaintiff was in fact liable on the guaranties, defendant had to make good on the counterguaranties. The court concluded that there plaintiff's claim did not satisfy the Article III case or controversy requirement. The court reasoned that plaintiff's claim for declaratory relief was completely dependent on the outcome of a separate action pending in Pakistan, and that: (1) there was no way of telling "when—if ever—[the Pakistani court] will rule"; and (2) there was no way to tell what relief the Pakistani court would grant if it did rule. *Id.* at 406. The court refused to assume, for the purposes of the litigation, that Pakistani courts would rule against the plaintiff, and to adjudicate the parties' rights based on that assumption. It concluded: "until Pakistan's courts act, [the court could not,] consistent with the Constitution's limits on federal jurisdiction, issue a binding declaration of … future rights." *Id.*

*Bellefonte Reinsurance Co. v. Aetna Casualty and Surety Co.*, 590 F.Supp. 187 (S.D.N.Y.1984), was yet another declaratory judgment action that depended on the outcome of a separate, pending lawsuit. Aetna—the defendant in *Bellefonte*—issued policies for primary and excess liability insurance to A.H. Robins Company, Inc. ("Robins"), insuring Robins against the risk of liability arising out of Robins' products. *Id.* at 189. Robins had $30 million in excess coverage under the first policies (1971 to 1972) and $50 million in excess coverage thereafter. Aetna sought reinsurance for its excess liability insurance policies; the plaintiffs were among these reinsurers.

Robins was sued by users of its products, and Aetna undertook to defend and indemnify Robins under the insurance policies. However, Robins disagreed with the way Aetna: (1) assigned a loss to a specific one-year policy; and (2) allocated its defense costs and claims expenses among loss years. *Id.* When the dispute could not be resolved, Robins sued Aetna in the Circuit Court of the City of Richmond, Virginia (the "Virginia litigation").

While the Virginia litigation was pending, the plaintiffs (reinsurers) claimed that Aetna was soliciting them to consent to a settlement with Robins, and "expressed the intention to sue those reinsurers that do not consent and that fail to pay their respective shares of any increased costs and expenses resulting from such a settlement." *Id.* at 190. "Apprehending that Aetna would settle the [pending] Virginia litigation with Robins despite plaintiffs' opposition … and that Aetna would then sue the reinsurers that refused to pay over any additional reinsurance liability created or reaffirmed by such settlement," the plaintiffs sued Aetna. *Id.* The plaintiffs sought a declaration that they had no obligation to reimburse Aetna for any defense costs or settlements in addition to the liability limits reinsured by the plaintiffs.

The court held that no "actual controversy" existed. It reasoned that, without a decision in the Virginia action, any decision it rendered would be "highly speculative and theoretical":

> Liability ... depends upon a determination of Aetna's liability to reimburse Robins for such costs and expenses pursuant to the primary and excess policies of insurance issued by Aetna. This question is centrally at issue in the Virginia litigation, and remains at present unresolved. No party either to the instant action or the Virginia litigation has paid or has even been adjudged liable to pay the defense costs and claims expenses in excess of the various policies limits. Whether, in the future, such sums will be paid or become legally payable it is, on this record, impossible to determine.

*Id.* at 191. It also reasoned that the issues in case before it could be "rendered moot by the eventual outcome of the Virginia litigation." *Id.* The court concluded that

> To speculate as to a possible resolution of the questions at issue in the Virginia litigation, and to seek a declaratory judgment based on such hypothetical results is actually to ask the opinion of this Court with reference to a situation that may never arise. The Constitution, however, precludes this Court from joining in such speculation.

*Id.* at 192.

*Bazarian International Financial Associates, L.L.C. v. Desarrollos Aerohotelco, C.A.,* 793 F.Supp.2d 124 (D.D.C.2011) concerned an inchoate financing arrangement, not a separate and pending lawsuit, but the rationale for finding no case or controversy was identical. There, the plaintiff—an investment bank—and the defendant—a hotel developer and owner—entered into an agreement whereby plaintiff would perform exclusive investment banking services for defendant in connection with the development of a luxury hotel and resort in Aruba. *Id.* at 126. In exchange for the plaintiff's services, the defendant agreed to pay plaintiff a percentage-based investment banking fee. The plaintiff would earn the fee upon settlement of binding loan or guarantee commitments for the hotel development project obtained by the plaintiff: (1) during the life of the agreement; or (2) or from parties the plaintiff introduced to the project if the financing concluded 36 months after the termination of the agreement. *Id.*

During the life of the agreement, the plaintiff allegedly introduced the defendant to key executive and decision-makers at AID Bank to begin the process of obtaining financing. The plaintiff claimed that it received a term sheet from AID Bank for the defendant, setting forth a total facility amount of $170 million. At some point thereafter, the plaintiff and defendants' relationship soured; defendant informed plaintiff that it did not intend to pay the investment banking fees specified in the Agreement, and that it believed that plaintiff had no role in facilitating its relationship with AIB Bank. *Id.* at 127.

The plaintiff filed a complaint seeking a declaration that it would be entitled to the investment banking fees called for under the agreement upon settlement of binding loan or guarantee commitments for the hotel development project from AIB Bank. *Id.* At the time it filed the complaint, plaintiff believed that the financing deal would close within 60 days. However, the loan was "never settled, closed, or [ ] drawn upon." *Id.*

The Court dismissed the suit for lack of a case or controversy, finding that the plaintiff had failed to establish a "practical likelihood that settlement of binding loan or guarantee commitments for the Project [would] actually occur." *Id.* at 129.

While the defendant and AIB Bank entered into a "binding and enforceable financing loan facility agreement," the financing commitment was "still subject to a numerous contingencies and conditions, has not been settled upon and there ha[d] not been any draws made by the borrowers pending a final closing." *Id.* at 130. Moreover, according to the defendants, it was "unknown when, and if, the various contingencies and conditions of the Facility Agreement [would] be satisfied and no settlement or closing date [was] currently scheduled to take place in the near future." *Id.* Based on these facts, the court could not conclude that there was a "practical likelihood" that the loan would ever settle, close, or be drawn upon.

 In all these cases, the underlying principle is the same: until it is clear that the parties are fighting over something more than the hypothetical outcome of a separate litigation, it is premature to decide which among several claimants would be entitled to any hypothetical proceeds.

In *SR International*—the non-precedential summary order—the court noted (because the parties did not dispute it) that there was a practical likelihood that the parties were fighting over *something* (either by way of settlement or verdict), and that the parties were correspondingly not fighting over a mere hypothetical outcome.

Here, by contrast, there is considerable dispute over whether the Prepetition Term Lenders (who are not parties to this declaratory judgment action) will ever have to pay a dime to the Old GM bankruptcy estate. The banks have fought the Avoidance Action tooth and nail since Day One. Both sides have moved for summary judgment, adhering to their respective positions. The motions have been *sub judice* for almost two years, and, as far as I am aware, no one has moved an inch. There is no way to predict what Judge Gerber's

decision might be. And if the Prepetition Term Lenders win and the Trustee loses—which, on the present record, is no less likely than the other way around, since nothing submitted to me suggests that either side has the upper hand—the estate will realize no money, and the Avoidance Action trust will never be funded. That renders the dispute before this Court lacking in sufficient immediacy and reality to warrant declaratory relief at this juncture. There is no case or controversy in the constitutional sense to decide; the action is not ripe.

Because this is so clear, it is unnecessary to do more than touch on the Committee's argument based on the Confirmed Plan.

In its June 15, 2012 letter to this Court, the Committee fleshed out the ripeness argument, which was vague below, and to which Judge Gerber paid no attention whatever. It now goes like this: pursuant to the Confirmed Plan, once the Avoidance Action was transferred to the Avoidance Action Trust, the Avoidance Action Trust Administrator (who is now pursuing that action) was required to prosecute and resolve the action "in the best interests of the beneficiaries of the Avoidance Action Trust." (Committee's June 15, 2012 Letter to the Court at 4 (quoting Confirmed Plan ¶ 35).) The Committee argues that the interests of the Governments and the unsecured creditors—who are the only possible beneficiaries of the Trust, as far as I am aware—*"may diverge,"* and that this potential for divergent interests might cause the Avoidance Action Trustee to be conflicted in his conduct of that litigation, and lead him to make choices that were harmful to the interests of the unsecured creditors. (*See id.* (emphasis added).)

But nothing about the Trustee's conduct of the underlying Avoidance Action creates

a case or controversy at the present time. The argument assumes that the Governments would have an interest in compromising the Avoidance Action at a lower number than does the Committee. The record, however, is barren of any evidence that: (1) the Committee's assumptions about divergence in any party's settlement strategy are grounded in fact; (2) there is even the slightest possibility that the Prepetition Term Lenders have any interest in settling the Avoidance Action—much less a "practical likelihood" that the Avoidance Action parties will settle; or (3) the Trustee, who is required under Paragraph 35 of the Confirmed Plan to handle the Avoidance Action "in the best interest of [all] the beneficiaries of the Avoidance Action Trust," presently feels at all conflicted about how to discharge his responsibilities, or would conduct the litigation differently if he knew the answer to the question posed by the complaint in this lawsuit. The Committee formulated this argument at the eleventh hour and fifty ninth minute, and it has no record from which it can argue, as a matter of fact, that there is a problem in need of a solution. Once again we are dealing in assumptions and hypotheticals—and it is the existence of hypothetical upon hypothetical than renders this case non-justiciable at the present time.

## CONCLUSION

The order appealed from is vacated, and the case remanded to the Bankruptcy Court with instructions to Judge Gerber to dismiss the complaint for want of subject matter jurisdiction. Dismissal is, of course, without prejudice. Should Judge Gerber decide the Avoidance Action in, favor of the bankruptcy estate, there will be a fully ripe case or controversy to decide, and a new declaratory judgment action can and should be filed immediately. The parties might even be able to stipulate to an expedited procedure, in which Judge Gerber's November 2011 decision is deemed to be the final decision and order in that new declaratory judgment action; that would allow for an immediate appeal.

Whatever procedure is adopted in the Bankruptcy Court, and whenever judgment is entered, I will accept the appeal from any declaration on this question under Rule 4(b) of the Local Rules for the Division of Business among District Judges of the Southern District of New York, which provides that a case previously dismissed and later re-filed is to be assigned to the judge who handled the original case. If such an appeal materializes, I will pull out my extensive notes and immediately get down to work on an opinion on the merits.

This constitutes the decision and order of the Court. The Clerk of Court is directed to close the above-captioned cases.